UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RICKY J. VALENTINE                          CIVIL ACTION

VERSUS                                      NUMBER: 11-2380

N. BURL CAIN, WARDEN                        SECTION: "N"(6)


## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(A), presently before the Court

is the 28 U.S.C. § 2254 application for federal habeas corpus relief of petitioner, Ricky

Valentine.   Upon review of the entire record, the Court has determined that a federal

evidentiary hearing is unnecessary.  *See* 28 U.S.C. § 2254(e)(2).[1]  For the following reasons,

it is recommended that the instant petition for habeas corpus relief be **DISMISSED WITH**

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily
mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary
hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule
of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim
relies on a factual basis that could not have been previously discovered by exercise of due
diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and
convincing evidence that, but for the constitutional error, no reasonable jury would have
convicted the petitioner.  28 U.S.C. § 2254(e)(2)(B).

**PREJUDICE**.

## I. PROCEDURAL HISTORY[2]

On May 13, 2004, petitioner, Ricky Valentine, was charged by indictment with the first degree murder of Linda Johnson while in the perpetration or attempted perpetration of an aggravated burglary. Valentine pled not guilty at his arraignment on May 25, 2004, and after a five day jury trial on June 7-11, 2004, he was found guilty of second degree murder. On August 12, 2004, Valentine was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Valentine's oral motion for appeal was granted. After the sentencing hearing, he filed motions for new trial, post verdict judgment of acquittal and post verdict modification of verdict. On August 19, 2004, the trial court set aside the sentence imposed on August 12, 2004, and the court considered the motions. All were denied. Valentine waived all legal delays and was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.

On April 5, 2006, the Louisiana Fourth Circuit Court of Appeal affirmed Valentine's conviction and sentence. *State v. Valentine*, 929 So.2d 779, No. 2005-KA-0223 (La. App. 4 Cir. 2006). On November 9, 2006, the Louisiana Supreme Court denied Valentine's writ application. *State v. Valentine*, 941 So.2d 34 (La. 2006).

---

[2]A portion of the procedural history has been taken from the Louisiana Fourth Circuit Court of Appeal's opinion, *State v. Valentine*, 929 So.2d 779, No. 2005-KA-0223 (La. App. 4 Cir. 2006).

Following the conclusion of his direct appeal proceedings, Valentine sought post-conviction relief. His efforts in this regard culminated on August 19, 2011, when the Louisiana Supreme Court denied his writ application. *State ex rel. Valentine v. State*, 67 So.3d 1248 (2011).

On September 16, 2011, Valentine filed the instant federal habeas corpus application. Valentine raises the following claims: 1) The trial court erred in refusing to instruct the jury on the charge of negligent homicide; 2) he was tried before the same judge who presided over the grand jury which indicted him; 3) the statute of limitations had expired by the time he was tried and convicted; 4) he was indicted by a grand jury from which African-Americans were racially discriminated against in the selection of jury forepersons; and, 5) he was denied effective assistance of counsel. In its response, the State concedes, and a review of the record confirms, that Valentine's habeas application is timely and that he has exhausted his state court remedies. Accordingly, the court will address the merits of Valentine's claims following its review of the facts and standard of review.

## II. FACTS[3]

Officer Yvonne Farve responded to a call at 2826 Clara Street, Apartment E, in the early morning hours of September 15, 2000. When she arrived on the scene, she knocked on

---

[3]The facts noted hereinafter are as set forth by the state appellate court in connection with Valentine's direct appeal. *State v. Valentine*, 929 So.2d 779 (La. App. 4th Cir. 2001).

the door but no one answered. The door had to be forcibly opened. Once the door was opened, the officer found a woman, in a seated position behind the door, bleeding from the back of her head and right abdomen. The officer tried to render aid, but the victim was unresponsive. The officer then requested an emergency unit. The victim was later identified as Linda Johnson. Officer Farve noted, upon viewing the scene, that the air conditioning unit had been pushed out of the window and was on the floor. The window above the air conditioning unit was open. The officer noted that there was water on the window ledge. When the emergency unit arrived, the medics rendered aid to the victim and transported the victim to the hospital. The officer spoke with the victim's children. She also requested a crime lab unit be sent to the scene. The officer then turned over the case to Detectives Crowden and Johnson.

Officer Karl Palmer, a technician with the New Orleans Police Department Crime Lab, was called out to he scene at 2826 Clara Street. The officer sketched the layout of the apartment. He noted that there were two drops of blood on the living room floor.

Detective Bernard Crowden was the lead detective who investigated the case. When he arrived on the scene, the victim had been transported to the hospital. The victim's four children (ages seven, nine, eleven, and thirteen) were still on the scene. A witness who lived across the street from the victim was located. The officer took statements from the witness, Eteria Nelson, and the victim's children. Detective Crowden noted that the air conditioning

unit was on the floor inside the residence. The officer also observed that there was water and condensation on the window ledge. He did not observe footprints in the area around the water. Detective Crowden stated that he did not see any watermarks in the apartment.

After Detective Crowden returned to the Sixth District office, he learned that petitioner, Ricky Valentine, was at Central Lockup. Detective Crowden went to Central Lockup and picked up Valentine. Valentine asked the officer if the victim, Linda Johnson, was dead. Ms. Nelson identified Valentine in a photographic lineup as the person she saw climbing into the victim's residence during the early morning hours of September 15, 2000. A search warrant was obtained for Valentine's mother's house. A red backpack containing Valentine's driver's license and other items belonging to Valentine was found during the search. The driver's license listed Valentine's mother's address as Valentine's address. Valentine's clothing tested negative for blood and gunpowder. Detective Crowden noted that there were no signs of a struggle on Valentine, i.e., there were no scratches or bruises. Valentine was initially arrested for attempted first degree murder. However, when it was learned that the victim had died at the hospital, Valentine was re-arrested for first degree murder. The victim died from three gunshot wounds-one to the head, one to the buttocks and one to the abdomen.

The officer obtained a copy of the apartment lease from the Housing Authority of New Orleans. The parties listed on the lease agreement were the victim, Linda Johnson, and her

four children. Valentine was not listed on the lease agreement.

Officer Jeffrey Wall and his partner, Officer David Osborne, were on their way to the Second District station when they saw a child, later identified as Paul Johnson, wearing only a shirt and underwear, running down Napoleon Avenue. The officers pulled their vehicle next to the child and blew the horn. The child then began flagging the officers down. After speaking with the child, the officers learned that a COPS[4] unit was handling a call of an aggravated battery by shooting. The COPS unit informed the officers that they had the scene under control and requested that the officers relocate to the scene with the child. When the officers arrived on the scene, they observed the victim being placed into an ambulance. The officers attempted to console the child, who was very emotional. The officers handed the child over to the detectives handling the case.

Dr. Richard Tracy performed the autopsy on the victim, Linda Johnson. The autopsy revealed that the victim had been shot three times. The first and fatal shot entered the victim above and behind the right ear. Bullet fragments were found in the victim's head. The second wound entered near the lower end of the spine, traveled through the kidney and liver, and ended beneath the skin. The bullet from the second wound was retrieved during the autopsy. The third wound was a flesh wound to the right buttock. The bullet passed through soft tissue under the skin and exited in front of the hip. All three wounds entered from the back of the

---

[4]Community Oriented Police Services.

body. Dr. Tracy testified that he would not expect much external bleeding from the gunshot wounds. The gunshot wound to the head would not bleed out but there would be bleeding inside the head. The gunshot wound in the abdomen damaged the kidney and liver but did not leave any route for blood to escape the body. The blood accumulated in the body cavity. The flesh wound to the buttock caused no significant injury, and there would be no blood from that wound.

Officer Kenneth Leary, a firearms examiner with the New Orleans Police Department Crime Lab, examined the bullets and fragments recovered during the victim's autopsy. Officer Leary was unable to determine if the bullets, .38 caliber, were fired from the weapon found on the premises due to the deformity of the bullets.

Caroline Johnson was seven years old when her mother, Linda Johnson, was killed. On the night of the incident, September 15, 2000, Caroline, her mother, her sister, Cassandra, and her two brothers, Paul and Jeremiah, were sleeping in the front room of their apartment. The children were sleeping on mattresses on the floor and Linda Johnson was sleeping on the sofa. Caroline awoke when she heard noise coming from the air conditioning unit. She saw the air conditioning unit fall on the floor and a man coming in through the window. She recognized the man as Valentine, her mother's boyfriend. Valentine was carrying a burgundy backpack and holding a gun. Cassandra grabbed Caroline's hand and they ran into the bathroom with their brother, Jeremiah. Cassandra

locked the bathroom. Caroline saw Paul, her older brother, run through the back door. After Valentine left, Caroline and her siblings came out of the bathroom. Her mother was lying by the front door, unable to walk or talk. Cassandra then called 911. Caroline testified that Valentine had been staying with them but that her mother had just broken up with him.

Jeremiah Johnson, the victim's youngest son, was nine years old at the time of the incident. He, his mother and his siblings were sleeping in the front room of their apartment when he heard noise from the air conditioning unit. He awoke to find Valentine pushing the air conditioning unit out the window. Jeremiah saw Valentine holding a backpack and a gun. He and his two sisters ran into the bathroom. Jeremiah's older brother, Paul, ran out the back door. While he was in the bathroom, he heard gunshots. After hearing the front door slam shut, Jeremiah and his sisters came out of the bathroom. His mother was lying on the side of the front door. She was bleeding and immobile. Cassandra called the police. Jeremiah stated that his mother and Valentine were dating but they had broken up shortly before the incident.

Paul Johnson, the victim's oldest child, testified that he was awakened by Valentine's voice. He heard Valentine calling his mother's name. Valentine was standing outside the window, holding a gun. Valentine had pushed the air conditioning unit out of the window. When Valentine started shooting, Paul ran out the back door of the apartment

to get help.  Paul ran down Napoleon Avenue and flagged a police officer.  The police officer took Paul back to his house.  Paul testified that Valentine did not live with them. He also stated that he did not see Valentine and his mother struggle for the gun.

Eteria Nelson lived across the street from the victim.  Her bedroom window faces the victim's apartment.  On the night of the incident, Ms. Nelson had left her bedroom window open.  She woke when she heard noise outside.  Ms. Nelson saw a man push an air conditioning unit out of a window and climb through the window.  She then heard gunshots.  A few minutes later, Ms. Nelson saw the same man exit the apartment from the front door and walk down the steps.  Ms. Nelson identified Valentine as the man she saw entering the victim's apartment from the window and leaving the apartment through the front door.

Sergeant Carlos Louque of the Orleans Parish Criminal Sheriff's Office was on duty on September 15, 2000.  Sergeant Louque was advised that a man had arrived at Central Lockup and wanted to turn himself in on a murder charge.  The officer went to Intake and Processing and met Valentine. Valentine told Sergeant Louque "he did a murder" and "wanted to turn [him]self in."  The officer asked Valentine when and where the murder occurred.  Valentine answered that he did not remember.  Sergeant Louque then ran Valentine's name through the computer and could not find any outstanding warrants. Noting that Valentine's address was listed as Third Street, the officer called the Second

District. Sergeant Louque was informed that there had been a shooting in the Sixth District. The officer from the Second District called Louque back and informed him that Valentine was wanted in regards to a shooting in the Sixth District and that officers from the Sixth District would be coming to pick up Valentine. When the Sixth District officers arrived, Valentine was arrested and placed in handcuffs.

Ricky Valentine testified on his on behalf. He acknowledged that he had fourteen prior convictions for simple robbery. He stated that he and the victim, Linda Johnson, had been involved for four years and lived together for three years. They became engaged in 2000. Valentine testified that he was self-employed as a trucker. He arrived home, at the victim's apartment, around 2:30 a.m. from a job. He entered the house from the front door, with a key, and noticed that Linda was sleeping on a mattress on the floor in the front room. The television was on. Linda got up and went to the bathroom. When she came back, she questioned him about his whereabouts. They quarreled, and she told him to leave. He went to take the air conditioning unit out of the window. Valentine testified that he purchased the unit. When he turned around, Linda was reaching for a gun in her closet. Valentine dropped the air conditioning unit and lunged toward Linda. They struggled and shots were fired. Valentine stated that Linda had firm control over the gun. After the shots were fired, Linda fell to the floor. Valentine told the children to stay in the apartment and he would go get help. He did not believe the telephone in the apartment

was working. He ran down the stairs and headed towards a grocery store on Washington Avenue to call the police. When he turned around he saw Paul standing on the steps, holding the gun. This frightened Valentine so he ran to his mother's house and told her what happened. His mother and brother then took him to Central Lockup. When he arrived at Central Lockup, he refused to speak with anyone. Valentine admitted that his driver's license, which was issued in June, 2000, listed his address as Third Street. He also acknowledged that he was not listed on the lease for the victim's apartment.

## III.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under §2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

§ 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* [*v. Taylor*, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## IV.  ANALYSIS

### A.  Jury Instruction on Charge of Negligent Homicide

Valentine argues that the trial court erred in failing to instruct the jury on the charge of negligent homicide. In support of his argument, Valentine submits nothing but state law.

It is well-established that a federal court does "not sit as [a] 'super' state supreme

court in a habeas corpus proceeding to review errors under state law." *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (quotation omitted). In *Swarthout v. Cooke*, __ U.S. __, 131 S. Ct. 859, 861, 178 L.Ed.2d 732 (2011), the Supreme Court found that the Ninth Circuit erred in "granting habeas relief based upon its conclusion that the state courts had misapplied [state law]...." The Court provided:

> The habeas statute "unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.' " *Wilson v. Corcoran,* ... 131 S.Ct. 13, 15, 178 L.Ed.2d 276 (2010) (*per curiam*) (quoting 28 U.S.C. § 2254(a)). "We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' " *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) *quoting Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

*Id.*

Further, a review of the reasoning on the part of the Louisiana Fourth Circuit in rejecting Valentine's claim reflects that he was clearly not entitled to a negligent homicide charge and, as such, suffered no violation of his right to due process as a result of the trial court's refusal to give such a charge.

In addressing the issue, the Louisiana Fourth Circuit first examined the elements of the crime of negligent homicide:

> Negligent homicide is the killing of a human being by criminal negligence....

13

Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.

*Valentine*, 929 So.2d at 785.

After noting that negligent homicide was not a responsive verdict to first degree murder, the state appellate court examined the pertinent testimony provided at trial:

Here, the eyewitness testimony and medical evidence refute [Valentine's] theory of a negligent homicide. The victim's children testified that the victim did not struggle with the defendant. They stated that the defendant shot the victim from the window. Further, Dr. Tracy testified that the gunshot wounds sustained by the victim entered from the back. Dr. Tracy opined that there was no possibility that the victim could have inflicted the wounds on herself during a struggle. The only testimony concerning a struggle came from [Valentine] . . . [who] asserts the *victim* always had the gun. According to his own testimony [he] never had the weapon.

*Id*. at 786.

Thereafter, the court reasoned:

In the case *sub judice* the testimony, including that of [Valentine], is bereft of any evidence that [Valentine] was negligent, much less grossly negligent. His testimony could have possibly served as a foundation for self-defense, but there is no criminal negligence aspect to such a defense. On the contrary, one has a privilege to defend one's self. The mere fact that there was a tussle does not automatically entitle defendant to a negligence homicide charge.

There was no evidence presented to the jury from which it could have

14

concluded that [Valentine's] conduct was in such disregard of the interests of others that it amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.

As there was no evidence from which the jury could infer that [Valentine] was guilty of negligent homicide, the trial court correctly denied [Valentine's] request to charge the jury on the issue of negligent homicide.

*Id*.

As noted earlier, in the absence of a constitutional violation, federal habeas corpus relief is not warranted. *See generally Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992), *cert. denied*, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); *Castillo v. Johnson*, 141 F.3d 218, 222 and 224 (5th Cir.), *cert. denied*, 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998). It is clear, based upon the above, that the evidence did not warrant a jury charge regarding negligent homicide. Thus, Valentine did not suffer a violation of his right to due process as a result of the trial court's refusal to provide such a charge.

### B.  Tried Before Same Judge Who Presided Over Grand Jury

Valentine, in support of the instant claim, provides the following factual basis: "Petitioner was indicted on November 26, 2000. Judge Calvin Johnson was the judge that presided over the grand jury at that time. On June 6-11, 2004, Petitioner was tried in Section "E", with Judge Calvin Johnson presiding over the trial." (Fed. rec., doc. 3,

Valentine's supporting memorandum, p. 10). Valentine asserts that he was denied due process because Orleans Parish Criminal District Court Judge Calvin Johnson presided over both his trial and his grand jury proceedings.

In connection with the instant claim, both Valentine and the State cite, in their respective memoranda, *Bigby v. Dretke*, 402 F.3d 551 (5th Cir. 2005). (*See* Fed. rec. doc. 3, Valentine's supporting memorandum, p. 10; Fed. rec. doc. 11, State's response, p. 19). In *Bigby*, the Fifth Circuit provided:

> [T]he United States Supreme Court has consistently enforced the basic right to due process and found that decision makers are constitutionally unacceptable when: (1) the decision maker has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) an adjudicator has been the target of personal abuse or criticism from the party before him; and (3) a judicial or quasi judicial decision maker has the dual role of investigating and adjudicating disputes and complaints.

*Bigby,* 402 F.3d at 558 -559 (citation omitted).

Valentine argues: "As grand jury judge, Judge Johnson assisted the grand jury in investigating [his] case" and, by virtue of his designation as trial judge, unconstitutionally took on the dual role of investigating and adjudicating disputes and complaints. (Fed. rec. doc. 3, Valentine's supporting memorandum, pp. 10-11). For the following reasons, Valentine's argument is without merit.

First, the Louisiana Fourth Circuit, in rejecting the instant claim, noted: "A trial

judge empanels a grand jury and addresses problems, if any, which may arise. A trial court does not preside over a grand jury session and is not privy to any evidence or testimony heard by the grand jury. *See* La. C.Cr.P. art. 433." *State v. Valentine*, No. 2010-K-0997 (La. App. 4 Cir. July 16, 2010) (unpublished opinion).[5]

Second, Judge Johnson did not empanel the grand jury which led to the indictment pursuant to which Valentine was tried and convicted. Rather, the original case, 418-106, arising from the November, 2000 grand jury session which Judge Johnson empaneled, was nolle prosequied. (St. rec., vol. 2, p. 286). The case, 448-390, which was tried before Judge Johnson, arose from a May, 2004 indictment. (St. rec., vol. 1). There is no suggestion that Judge Johnson empaneled the grand jury which resulted in Valentine's May, 2004 indictment.

Third, assuming *arguendo* that a conflict of interest did arise as a result of the fact that Judge Johnson empaneled the grand jury that issued the first indictment against Valentine and later presided over Valentine's trial, there is no basis for habeas relief. Valentine has failed to show that Judge Johnson's association with the original grand jury had any adverse effect on his trial rulings. *See Newton v. Warden of Buckingham Correctional Center*, 2002 WL 32598842, *2 (W.D. Va. Aug. 5, 2002) (petitioner not

---

[5]A copy of the Louisiana Fourth Circuit's unpublished opinion is contained in the State rec., vol. 5.

entitled to habeas relief as a result of his failure "to demonstrate that the judge's involvement with the grand jury had any specific, adverse effect on rulings that the trial court made in [petitioner's] case.").

## C. Expiration of Statute of Limitations

Valentine argues that his Sixth Amendment right to a speedy trial was violated because he was indicted in November, 2000, marking the institution of prosecution, and he was not tried until approximately three and a half years later, in June, 2004. (Fed. rec. doc. 3, Valentine's supporting memorandum, pp. 11-12). Valentine asserts that Louisiana, in order to protect a defendant's fundamental right to a speedy trial, "mandates that the defendants charged with capital crimes must be tried within three years from institution of prosecution. La. C.Cr.P. art. 578." (Fed. rec. doc. 3, Valentine's supporting memorandum, p. 12). Valentine's argument is without merit for the following reasons.

First, in addressing the instant claim on post-conviction, the Louisiana Fourth Circuit Court of Appeal concluded that the State, in bringing Valentine to trial in June, 2004, did not run afoul of state law. The court reasoned:

> The relator's motion to quash filed on 9 July 2003 suspended the three-year period to bring him to trial and a new three-year period would begin to run anew from the date of the trial court's action on the motion. *See* La. C.Cr.P. arts. 578, 579, and 580. No ruling was ever rendered on the motion to quash. A new indictment was filed on 13 May 2004 after the original case was nolle prosequied. The relator's trial commenced on 7 June 2004, which was within the remainder of the three-year period from the

suspension of 9 July 2003.

      The relator has not demonstrated or shown that he would not have been re-indicted even if his original indictment had been quashed.

*State v. Valentine*, No. 2010-K-0997, pp. 1-2.

Second, even if Valentine's June, 2004 trial had run afoul of state law, such a violation would not automatically warrant a finding that his constitutional right to a speedy trial had been violated. In *Barker v. Wingo*, 407 U.S. 514, 529-530, 92 S.Ct. 2182, 2191-2192, 33 L.Ed.2d 101 (1972), the Supreme Court specifically declined to set a fixed-time period when trials must be initiated because such a ruling would go "further than the Constitution requires". Instead, the Court adopted a "balancing test", requiring "courts to approach speedy trial cases on an ad hoc basis." *Id*., 407 U.S. at 530, 92 S.Ct. at 2192. The Court provided:

> We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right [to a speedy trial]. Though some might express them in different ways, we identify four factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

*Id*. (footnote omitted).

In the instant matter, assuming *arguendo* that the length of the delay did trigger further analysis, Valentine has made no showing of prejudice. Thus, the court finds that Valentine's constitutional right to a speedy trial was not violated.

### D. Unconstitutional Composition of Grand Jury

Valentine argues that he was deprived of equal protection of law and due process because he was indicted by a grand jury from which African-Americans were racially discriminated against in the foreperson selection process.

The United States Supreme Court has made clear "that a criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded." *Rose v. Mitchell*, 443 U.S. 545, 556, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739 (1979); *see also Alexander v. Louisiana*, 405 U.S. 625, 628, 92 S.Ct. 1221, 1224, 31 L.E.2d 536 (1972) ("[A] criminal conviction of [an African-American] cannot stand under the Equal Protection Clause of the Fourteenth Amendment if it is based on an indictment of a grand jury from which [African-Americans] were excluded by reason of their race."). If a petitioner successfully demonstrates racial or gender discrimination in the selection of the grand jurors who indicted him, he is entitled to relief notwithstanding his failure to demonstrate prejudice therefrom. *Id.*; *Neal v. Delaware*, 103 U.S. 370, 394 (1880).

In *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), the United States Supreme Court set forth what a petitioner must show to prove "an equal protection violation has occurred in the context of grand jury selection".

[He] must show that the procedure employed resulted in substantial

underrepresentation of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. This method of proof, sometimes called the 'rule of exclusion,' has been held to be available as a method of proving discrimination in jury selection against a delineated class. Finally, . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raise by the statistical showing. Once [a petitioner] has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case.

*Id*. 430 U.S. at 494-495, 97 S.Ct. at 1280 (citations and footnote omitted).

In an effort to satisfy the above-described burden of proof, specifically, the requisite degree of underrepresentation of African-Americans, Valentine provides no independent evidence, but rather, relies solely on the evidence submitted in a case arising from Orleans Parish Criminal District Court, *State v. Fleming*, No. 401-182, Section "K", wherein the Honorable Arthur L. Hunter quashed an Orleans Parish grand jury indictment based upon a finding that the defendants, Fleming and Trainor, had presented, and the State had failed to rebut, prima facie cases of discrimination in the selection of grand jury forepersons in Orleans Parish between the years 1987 and 2000, all in violation of the Fourteenth Amendment.[6]  However, on appeal, the Louisiana Fourth Circuit reversed

---

[6]The court notes that only Valentine's initial indictment, in November, 2000, is covered by the time period on which Valentine's statistical evidence is based. It was an indictment

Judge Hunter's decision, finding that the evidence provided by Fleming and Trainor, the same evidence relied upon by Valentine, was insufficient for the purpose of satisfying the burden of proving a sufficient underrepresentation via a comparison of the proportion of African-Americans in the total population with the proportion of African-Americans called to serve as grand jurors. *State v. Fleming*, 846 So.2d 114, 120 (La. App. 4 Cir. 2003). The Louisiana Supreme Court thereafter denied defendants' writ application. *State v. Fleming*, 860 So.2d. 1132 (La. 2003).

The evidence submitted by Valentine in support of his claim that the grand jury which indicted him was chosen in violation of his right to equal protection has not only been deemed insufficient to satisfy the requisite burden of proof in *Fleming*, 846 So.2d at 120, it has likewise been deemed insufficient by sections of this court.

In *Lindsey v. Cain*, 2009 WL 1575466 (E.D. La. May 29, 2009) (Moore, MJ.), Lindsey argued that his constitutional rights were violated by virtue of the fact that the grand jury foreperson of the Orleans Parish grand jury which indicted him had been selected in a discriminatory manner. In support of his claim, Lindsey, like Valentine, relied solely upon the evidence submitted in support of the equal protection claim raised in *State v. Fleming*, Orleans Parish Criminal District Court No. 401-182, Section "K". The court, in rejecting Lindsey's claim, noted that Lindsey's reliance on *Fleming, supra,*

---

outside this period, in May, 2004, which led to Valentine's conviction.

was misplaced as the *Fleming* court's decision finding an equal protection violation had been "reversed and vacated". *Lindsey*, 2009 WL 1575466 at *10.

The court went on to determine that he agreed with the state appellate court's decision to reverse the district court's finding of an equal protection violation based upon the evidence provided. Specifically, the court provided:

> [B]ased upon the statistics offered, this court is in agreement with the state appellate court's reasoning in *Fleming*, 846 So.2d 114, that the evidence does not establish substantial under-representation. The burden is on petitioner to establish, as part of his prima facie case, substantial under-representation. *Castaneda*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498. The evidence submitted in the *Fleming* case showed that a total of thirty-one forepersons were chosen during the relevant thirteen year period, of which the race . . . of six grand jury forepersons were unknown. As the state appellate court found in *Fleming*, the "[d]efendants' statistical evidence was flawed because it was drawn from incomplete data . . . it is quite possible that 'the missing data could prove no disparity at all in the race . . . of the forepersons." *Fleming*, 846 So.2d 122. In other words, if out of those thirty-one grand jury forepersons, there were sixteen African-Americans (10 known to be African-American and 6 whose race was unknown but potentially African-American), then more than 51.6 percent of the grand jury forepersons could have been African-American. Since blacks comprised 58 percent of the registered voters at that time, the absolute statistical disparity would be less than 7 percent. Although the Supreme Court "has never announced mathematical standards for the demonstration of systematic exclusion of blacks," *see Rideau v. Whitley*, 237 F.3d 472, 487 (5th Cir.2000) (citations and internal quotations omitted), the U.S. Fifth Circuit has found that absolute disparities of 10 percent or less are insufficient to warrant relief. *See Mosley v. Dretke*, 370 F.3d 467, 479 (5th Cir.2004) (Absolute difference of 9.4 percent does not establish substantial under-representation), *citing United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir.), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980) (less than 10 percent disparity insufficient to warrant relief).

*Lindsey*, 2009 WL 1575466 at 10.

Similarly, in *Jones v. Cain*, 2010 WL 3924010, 24 (E.D. La. Sept. 10, 2010) (Roby, MJ.), Jones, in connection with his equal protection claim in the context of the selection of his grand jury foreperson, submitted no documentation or other evidentiary support for his claim. Instead, Jones relied upon "the statistics introduced into evidence in the *Trainor/Fleming* case", Orleans Parish Criminal District Court No. 401-182, Section "K". *Id*. In rejecting Jones's equal protection claim, the court agreed with the Louisiana Fourth Circuit's assessment in *Fleming*, 846 So.2d at 122, that the statistical evidence, submitted in the *Trainor/Fleming* case and relied upon by Jones, was deficient as a result of its incompleteness. *Jones*, 2010 WL 3924010 at *25.

Based upon the above, this court finds that Valentine has failed to make the requisite prima facie case to show that the foreperson for the grand jury which indicted him was selected in a discriminatory manner. Thus, his claim for habeas relief is without merit.

### D. Ineffective Assistance of Counsel

Valentine argues that his trial counsel was ineffective in the following respects: 1) He failed to file a motion to recuse Judge Johnson based upon the fact that Judge Johnson presided over the grand jury which originally indicted him; and, 2) he failed to file a motion to dismiss the charge on the ground that the statute of limitations to commence trial

had expired.

The seminal case for adjudicating a habeas petitioner's ineffective assistance of counsel claim is *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), which places on petitioner the burden of demonstrating not only that his counsel's performance was deficient, but also that he was prejudiced as a result of counsel's deficient performance. If a court finds that a petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong. *Id*.

Under the deficient performance prong of the *Strickland* test, "... it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993),quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. "'An attorney's performance, which enjoys a strong presumption of adequacy, is deficient if it is objectively unreasonable." *United States v. Walker*, 68 F.3d 931, 934 (5th Cir. 1995), *cert. denied*, 516 U.S. 1165, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996), *quoting United States v. Acklen*, 47 F.3d 739, 742 (5th Cir. 1995), *cert. denied*, 519 U.S. 1142, 117 S.Ct. 1017, 136 L.Ed.2d 893 (1997). To prove prejudice under the *Strickland* standard, a petitioner "... must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*,

466 U.S. at 694, 104 S.Ct. at 2068.

Valentine has failed to satisfy his burden of proof with respect to his ineffectiveness claim as he has failed to show he was prejudiced by counsel's alleged deficiencies. As set forth above, there was no valid basis to have Judge Johnson recused from presiding over Valentine's trial. Further, there was no basis to file a motion to dismiss the charge since there was no violation of the three-year statute of limitations as set forth under La. C.Cr.P. art. 578.

The law is clear that an attorney is under no obligation to raise an objection or argument when the chance of success is unlikely. *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point."); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite.").

Thus, the court finds that counsel was not ineffective in failing to file a motion to recuse Judge Johnson and failing to argue that the State was untimely in failing to initiate trial proceedings prior to June, 2004. Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the application for federal habeas corpus relief filed on behalf of petitioner, Ricky J. Valentine, be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)(*en banc*).[7]

New Orleans, Louisiana, this __12th__ day of _____January_____, 2012.

LOUIS MOORE, JR.
United States Magistrate Judge

---

[7]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.